**ASTRO CINEMA CORP. INC.,** John Justin and Jess Rockman, Appellants,

v.

Thomas J. **MACKELL,** District Attorney of Queens County, Appellee.

No. 462, Docket 34025.

United States Court of Appeals, Second Circuit.

Argued Jan. 15, 1970.

Decided Feb. 24, 1970.

Eleanor Jackson Piel, New York City, for appellants.

Mortimer Sattler, Asst. Atty. Gen., Louis J. Lefkowitz, Atty. Gen. of the State of New York, for appellee.

Before KAUFMAN and FEINBERG, Circuit Judges, and PALMIERI,* District Judge.

IRVING R. KAUFMAN, Circuit Judge.

On May 7, 1969, acting pursuant to a warrant issued earlier the same day, police seized the motion picture film "The Odd Triangle" and arrested the projectionist and threatre manager at the Hollis Cinema Theatre, in Queens, New York, charging them with violation of New York's obscenity statute, Penal Law, McKinney's Consol.Laws, c. 40, § 235.05. Appellants, Astro Cinema Corp. Inc., owner of the theatre, John Justin and Jess Rockman, company president and theatre manager, respectively, brought an action in federal court, and moved to convene a three-judge district court to declare the New York obscenity statute unconstitutional, to enjoin State prosecutions under it and to order return of the film. Judge Dooling denied the motion, but also denied a cross-motion to dismiss, reading plaintiff's paragraph 5 as attacking lawless local action, a matter appropriate for a one-judge court.

This case is almost precisely on all fours with Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969), which was not decided until after the able district judge entered the judgment below. There, as here, the judicial officer who issued the warrant first viewed the very same film, and determined to his satisfaction that it was obscene. In Bethview, as here, apparently only one print of the film was seized. There, as here, obscenity was not in issue; the theatre owner claimed only that he should have been afforded an adversary hearing before the film was seized. The relief sought by the theatre owner in Bethview—return of the film—was granted; we reach the same result here on that portion of the prayer for relief. However, in view of the other claims for relief urged, as well as the uncertainty that has arisen over the proper procedures to be followed in seizures of items allegedly protected by the First Amendment, we believe a more extended discussion appropriate.

No serious dispute exists over the proposition that the First Amendment protects motion pictures as well as books, newspapers, and the like. See, e. g., Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). The difficulty has been in transferring doctrines announced in cases that frequently involve printed material to the often different factual situa-

* Of the Southern District of New York, sitting by designation.

tions presented when films are seized. Several general principles may, however, be distilled from recent Supreme Court opinions. Pursuant to a vague warrant, issued *ex parte*, police in Missouri seized approximately 11,000 copies of 280 different publications. In striking down the seizure, the Court found that the warrants issued left too broad a discretion in the police officers who executed the warrant, for they were permitted, in effect, to seize anything they considered obscene. Marcus v. A Search Warrant of Property, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). The Court renounced the principle

> "that the State may impose the extensive restraints imposed here on the distribution of these publications prior to an adversary proceeding on the issue of obscenity, irrespective of whether or not the material is legally obscene." 367 U.S. at 735–736, 81 S. Ct. at 1718. See also A Quantity of Books v. Kansas, 378 U.S. 205, 210, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964).

■ *Marcus* instructed that seizures of allegedly obscene material before an adversary hearing on obscenity would be struck down if they were overbroad; A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) condemned seizure of all copies of a relatively narrow class of publications, pursuant to an *ex parte* order by a judge who had read several exemplars. Where *Marcus* concentrated on the breadth of the seizure, *A Quantity of Books* focused on its effect on a single class of publications; in both cases the Court condemned substantial restraints prior to an adversary hearing on the rationale that the procedures employed did not afford "a reasonable likelihood that nonobscene publications, entitled to constitutional protection, will reach the public." 378 U.S. at 211, 84 S.Ct. at 1726, quoting 367 U.S. at 736, 81 S.Ct. 1708. See also Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); accord Teitel Film Corp. v. Cusak, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed. 2d 966 (1968) *(per curiam)*.

Both *Marcus* and *A Quantity of Books* dealt with publications; in each the police seized so many of one variety, or so many varieties, that they restrained communication of the material contained therein to a substantial audience. The State contends that seizure of this single film is clearly distinguishable; rather than seizing all copies from the distributor, they argue, they took only the one copy that he was prepared to show, and they are holding it only for the purpose of introducing it in evidence at a criminal prosecution of the theatre manager and the projectionist. The difficulty with the State's position, however, is that it does not distinguish, as we did in *Bethview*, a single copy of a book from a single copy of a film. The restraint involved in seizing a single copy of a book is exceedingly small; the dealer will usually have additional copies that can be sold. Indeed, as is often the case, it is far easier for the police to purchase one copy of the charged writings, and then introduce it into evidence.

■ A film, however, is not directed to a single purchaser; it is aimed at all those who would be in the audience on the days that the film is scheduled to be shown. We are not told the size of the Hollis Cinema Theatre; but assuming it to have been no larger than the Bethview Theatre (300 seats), it could have had a potential audience of 4000 persons a week "assuming half of [the seats] to be occupied for four showings of a film each day for a week." See Bethview Amusement Corp. v. Cahn, 416 F.2d 410, 412 (2d Cir. 1969). Preventing this number of persons from viewing a film is certainly equivalent to seizing all copies of a book from the newsdealers involved in *A Quantity of Books*; in the functional terms we must use to balance the interest in suppressing obscenity against that of ensuring distribution of nonobscene views, the restraint here and in *Bethview* is, if anything, more substantial than the seizure of less than 2000 books. It is no answer to urge, as the State does, that the Hollis Cinema might have been able to procure another

copy of the film; by the same token, another shipment of the magazines or books in *Marcus* and *A Quantity of Books* might have been obtained from the distributor or publisher. The point in each instance is that if the State wishes to interfere substantially with distribution of films or books, it must first provide, as we have been instructed, an adversary hearing capable of affording a "reasonable likelihood" that nonobscene films or books will reach the public. Marcus v. A Search Warrant of Property, 367 U.S. 717, 736, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); A Quantity of Books v. Kansas, 378 U.S. 205, 211, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964).

■ In United States v. Wild and Corrado, (2d Cir. Oct. 29, 1969) 422 F. 2d 34, 39, rehearing denied (2d Cir. Feb. 2, 1970), allegedly obscene color slides were seized upon the arrest of defendants after indictment, but without a prior adversary hearing; some of these slides were introduced into evidence in the subsequent criminal trials of defendants for violations of 18 U.S.C. § 1461. On appeal from conviction, defendants argued that "any seizure" of allegedly obscene material—even a sample seized for evidentiary purposes as incident to a lawful arrest—is illegal if not preceded by an adversary hearing and therefore the convictions had to be reversed. The panel in *Wild* rejected that contention. On rehearing, the panel made clear that because the argument was "belated" and the record "inadequate," it specifically did not address itself to the further argument that the seizure of the slides in that case was so vast as to be similar in constitutional effect to the "massive seizures" of books involved in *Marcus* and *A Quantity of Books*. United States v. Wild and Corrado, *supra*, 422 F.2d at 34, 39. We view *Wild* as merely saying that a particularized search for specific samples of slides or publications, designed to provide evidence for a subsequent obscenity prosecution, and not substantially restraining distribution of the material involved, does not violate *Marcus* or *A Quantity of Books*. See United States v. Marti and Saks, 421 F. 2d 1263 (2d Cir. Feb. 3, 1970). In any event, we find it clearly inapplicable to the seizure of a film which is to be shown to a large public audience, which we hold must be preceded by an adversary hearing. We are buttressed in our view by 208 Cinema, Inc. v. Vergari, Docket No. 33997 (2d Cir., reversed in open court Oct. 9, 1969), a case, *like Bethview*, involving seizure of a film, and in which we ordered the film returned. Accord, Tyrone Inc. v. Wilkinson, 410 F.2d 639 (4th Cir. 1969); Metzger v. Pearcy, 393 F.2d 202 (7th Cir. 1968); Cambist Films, Inc. v. Illinois, 292 F.Supp. 185 (N.D.Ill.1968); Cambist Films, Inc. v. Tribell, 293 F. Supp. 407 (E.D.Ky.1968). But see Commonwealth v. State Amusement Corp., 69 Mass.Adv.Sh. 1003, 248 N.E.2d 497 (1969), criticized in Monaghan, First Amendment "Due Process," 83 Harv.L. Rev. 518, 535 n. 65 (1970).

■ While the weight of logic and authority clearly direct us to order return of the film to those from whom it was seized, the State argues that to do so would be to deprive it of the opportunity to introduce the film into evidence, for the plaintiffs may now destroy the film, remove it from the jurisdiction, or edit those portions deemed obscene by the State. Without issuing an advisory opinion on what remedies the State may pursue to avoid this dilemma, we note only that prior opinions have suggested several possibilities, leaving their resolution for an actual controversy. In *Bethview* we mentioned an *ex parte* restraining order or a subpoena *duces tecum*; *Metzger* and *Tyrone* permitted an order allowing the State to demand a copy of the film to aid in the preparation and trial of its case. With these alternatives available the State's claim that we have left it with no means to enforce its obscenity statutes is barren. Indeed, should it be determined that these procedures are proper, they might provide a reasonable and non-burdensome reconcil-

iation of the interest in allowing the exercise of free speech with the aim of punishing those who abuse it.

■■ We are not disposed, however, to disturb the district court's refusal to enjoin criminal prosecution of the plaintiffs, or declare the obscenity statute unconstitutionally vague. It appears settled that unless the statute under which the prosecutions are initiated is unconstitutional on its face, or the statute is applied in bad faith "for the purpose of discouraging protected activities," the federal courts will be bound by the prohibition in 28 U.S.C. § 2283 (1964), and will not enjoin state criminal proceedings. See Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Douglas v. City of Jeanette, 319 U.S. 157, 164, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). See also Tyrone, Inc. v. Wilkinson, 410 F.2d 639, 642 (4th Cir. 1969); Metzger v. Pearcy, 393 F.2d 202 (7th Cir. 1968). But see Cambist Films, Inc. v. Illinois, 292 F.Supp. 185 (N.D.Ill.1968). There is no indication at this stage in the proceedings that the State prosecutions have been initiated in bad faith to stifle free expression; nor is the obscenity statute itself unconstitutional on its face. See Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L. Ed.2d 56 (1966); Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S. D.N.Y.1969) (three-judge district court). We thus regard plaintiffs' requests for orders declaring the obscenity statute unconstitutional, and enjoining criminal prosecutions under it as completely unwarranted.

■ Finally, we must deal with the claim that a three-judge district court should have been convened pursuant to 28 U.S.C. § 2281 (1964), since the complaint sought an injunction restraining enforcement of a state statute.[1] The question is not without difficulty. The predecessor to § 2281 was enacted in 1910 in response to Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which permitted federal injunctions against state officers enforcing unconstitutional state statutes, despite the Eleventh Amendment's prohibition of suits against a State. See Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 77, 80 S.Ct. 568, 4 L. Ed.2d 568 (1960). The "principal concern" prompting enactment of the three-judge statute was the power of "one federal judge" to enjoin operation or enforcement of a state statute.

■ Subtle distinctions have developed to govern situations in which § 2281 might be thought to apply. If the statute is attacked as unconstitutional as applied then a three-judge court must be convened before its enforcement may be restrained; but a petition "which seeks an injunction on the ground of the unconstitutionality of the result obtained by the use of a statute which is not attacked as unconstitutional," does not call for a three-judge court. Ex parte Bransford, 310 U.S. 354, 461, 60 S.Ct. 947, 84 L.Ed. 1249 (1940). See C. Wright, Federal Courts 164 (1963). The distinction appears to be between acts the state statute permits (but does not necessarily require), and actions taken in reliance on, but in excess of, the State statute's authority. Astro Cinema argues that its petition covers the first illustration; the state urges the second applies.

It is important to note precisely what statute is in issue on the request for the

---

1. 28 U.S.C. § 2281. Injunction against enforcement of State statute; three-judge court required.

An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

injunction against the statute as applied. Since the principal thrust of plaintiffs' attack is on the seizure itself, it becomes clear, therefore, that it is not the general obscenity statute, held constitutional in Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966) but the search warrant statute, N.Y.Code Crim.Proc. §§ 791–813 (McKinney Supp. 1969), which applies to all search warrants issued for any purpose whatever, that is in issue. The usual procedure is for a magistrate or judge to issue such warrants *ex parte*, after an affidavit is filed. See N.Y.Code Crim. Proc. §§ 793 to 797–a. In this case, a judge of the Criminal Court of New York City himself viewed the film in question before issuing the warrant; such a procedure appears common under New York law. See, e. g., Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969). While a district court has held that the New York statute does not forbid an adversary hearing, Rage Books, Inc. v. Leary, 301 F.Supp. 546 (S.D.N.Y.1969), and New York does have a civil injunction proceeding that would permit an adversary hearing, N. Y.Code Crim.Proc. § 22–a (McKinney Supp.1969), § 791 et seq. does represent the routine method for obtaining evidence with which to commence a criminal prosecution. As such, the actions taken to seize the film appear to be within the intendment of the statute, and thus the attack is on the statute "as applied," and a three-judge court should have been convened, if the constitutional objection was substantial. See Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L. Ed. 152 (1933); 1A J. Moore, Moore's Federal Practice § 0.205, at 2333 (1969).

While the application did raise constitutional objections that could not be described as clearly insubstantial, though they did not convince either us or the District Court, nonetheless, we do not reverse on this point, for we believe that to do so would be futile. There must be a demand for injunctive relief to bring § 2281 into play. See Ream v. Handley, 359 F.2d 728 (7th Cir. 1966); C. Wright, Federal Courts 164 (1965). Here there was a demand for injunctive relief joined with one for the return of the film. While we have directed the film to be returned (and suggested means for making it available at trial) the injunction, the substance of the requirement for application of § 2281, has not been granted; and as in Green v. Board of Elections of the City of New York, 380 F.2d 445, 449 (2d Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968), we see little point in reversing denial of the three-judge court application when to do so could lead only to dismissal by two district judges and one appellate judge instead of three appellate judges. This is particularly so when the aim of § 2281 was to protect the States against declarations of unconstitutionality emanating from a single district judge. While it is true that plaintiff loses his direct appeal to the Supreme Court, not only is that body capable of remedying any injustice through the device of certiorari, but the direct appeal provision, in context, seems far more likely to have been for the benefit of the state than the plaintiff. *Cf.* D. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1 (1964). We do not regard our order requiring return of the films as enjoining operation of the statute; it is perfectly possible that the state may, using some or any of the alternatives suggested here or in *Bethview* or *Tyrone*, succeed in reconciling the interest in securing evidence represented by the search warrant statute with the First Amendment principle of avoiding substantial restraints on speech without a prior adversary hearing.