Jasen, J.
(dissenting). In this obscenity case, the majority holds that the five affidavits in question, which describe the content and character of video movies as graphically depicting successive acts of deviate sexual conduct, including incestuous intercourse, oral and anal sodomy, and onanism, are insufficient, as a matter of law, to support a magistrate’s determination of probable cause that those video movies were obscene. Because I believe that the materials ordered seized by the magistrate were adequately described in the affidavits, as set forth in full in the appendix to this opinion,* [1]1 would hold that the magistrate had “enough information before him” to reasonably believe that the video movies were obscene as legislatively defined and, therefore, that the warrant was properly issued.
At the outset, it is important to note that what is before us is not whether the defendants are guilty beyond a reasonable doubt of promoting or possessing obscene material, as that would require a full adversary hearing, but rather, simply whether the magistrate, in issuing the warrant to seize the movies, had probable cause to believe that they were obscene.
The majority today holds that unless obscenity is unambiguously established by the affidavits in question, a magistrate is incapable of rendering a probable cause determination to issue a warrant for the seizure of sexually explicit films, described in those affidavits, solely for evidentiary purposes. This adopted position has never been advanced by the United States Supreme Court, and has been rejected unanimously by the Federal courts and by an overwhelming number of the sister state courts that have considered it (see, infra, at pp 581 to 583). Thus, in my opinion, the majority has undermined the policies advanced by a rigorous enforcement of the obscenity laws; disregarded traditional principles governing judicial review of a magistrate’s determination of probable cause, and blurred the distinction between probable cause and guilt; failed to recognize that the magistrate had reasonable grounds to believe that the affidavits *574 described the content and character of each movie as a whole; and misconstrued the limited purpose of the warrant.
Defendants Erhardt and P. J. Video, Inc., are each charged with six counts of obscenity in the third degree, a class A misdemeanor. The prosecutions stem from investigations of defendants by the Erie County District Attorney’s office. David J. Groblewski, a confidential criminal investigator assigned to the Erie County District Attorney’s office, and previously a member of the New York State Police for 25 years, reviewed 10 video cassette movies which had been rented from defendants by a member of the Erie County Sheriff’s Department. The 10 video cassette movies were selected from the “Adult Cassette Movie List”, which contained a total of 30 films and was printed upon the letterhead of Network Video, the business name under which defendants conducted business. Investigator Groblewski viewed the movies in their entirety and summarized the theme and conduct depicted in each film. Sworn affidavits describing the movies were submitted by Investigator Groblewski, and annexed to the application for a warrant authorizing the search of defendants’ premises. On November 21,1983, Supreme Court Justice Theodore S. Kasler, issued a search warrant which authorized the Village of Depew Police Department to make a search of defendants’ premises. The warrant specifically authorized a search for the following video cassette movies entitled: “California Valley Girls”, “Taboo II”, “Taboo”, “All American Girls”, “Debbie Does Dallas”, “Body Magic”, “Deep Throat”, “Every Which Way She Can”, “Filthy Rich” and “Little Girls Blue”. The warrant also authorized a search for “any personal papers or documents which tend to identify the owner, leasee [sic] or whomever has custody or control over the premises or vehicle searched or the items seized, and seize said property forthwith”. The warrant was based upon the application of Sergeant Scioli, the affidavit of Erie County Sheriff Deputy Costanza, and 10 affidavits prepared by Investigator David Groblewski.
As a result of the execution of the warrant on November 22, 1983, the defendants’ premises were searched and one or two copies of each of the movies named in the warrant application, together with certain documents, were seized as evidence for trial. A sworn itemized inventory statement, dated December 5, 1983 and completed by Sergeant Scioli, clearly indicates that only one or two copies of each cassette tape named in the warrant application were seized. By order dated December 5, 1983, Justice Kasler directed that the seized property be tempo *575 rarily retained, in the furtherance of justice, pursuant to CPL 690.05 through 690.55. While the 10 films named in the warrant application were seized, defendants were charged with promoting obscenity only with respect to five of those films, to wit: “Taboo”; “All American Girls”; “Debbie Does Dallas”; “California Valley Girls”; “Taboo II”.
Defendants made an omnibus motion before Depew Village Court seeking, inter alia, suppression of the seized films. A review of defendants’ affidavit in support of the omnibus motion, and arguments of defense counsel advanced at the suppression hearing, reveal that the sole ground upon which defense counsel sought suppression was that due to the magistrate’s failure to personally view the films in question, the warrant was constitutionally infirm. Paragraph 73 of defendants’ affidavit contended: “Thus, it is clear that under New York law before a search warrant may be issued regarding materials presumptively protected under the First Amendment, which the video tapes in this case indisputably are (Interstate Circuit v Dallas, 390 US 676 [1968]; Kingsley Pictures Corp. v Regents, 360 US 684 [1959]; Joseph Burstyn, Inc. v Wilson, 343 US 495 [1952]; Monserrate v Upper Ct. St. Book Store, 49 NY2d 306), two distinct procedures must be engaged in by the issuing magistrate prior to the authorizing a search warrant: (a) the issuing Magistrate must himself personally review the facts (i.e., the materials themselves) upon which he is called to render a judgment of probable cause; and (b) the inquiry must ‘focus searchingly’ on the issue of ‘obscenity’.” Paragraphs 74 and 75 of the affidavit clarified the constitutional flaw perceived by defense counsel: “In this case, it is clear that Justice Kasler did not personally review the video tapes but instead unconstitutionally delegated his duty of examining the full facts regarding the films’ obscenity to various law enforcement officers * * * Here, Judge Kasler allowed Investigator Groblewski to determine whether probable cause existed to believe that the films were obscene — a determination which our Courts have long recognized is a matter of personal taste and must be performed by a neutral and detached Magistrate, not a law enforcement officer [citations omitted].”
At the motion hearing, held on February 15, 1984, defense counsel reiterated the thrust of his argument: “The procedure is, at least in this state, a magistrate, in order to fulfill that constitutional requirement of prior judicial scrutiny and focus upon that issue, has to look at the film or magazines or material in question.” Defense counsel stressed: “Continuously, the Court of Appeals said the magistrate is to look at the particular *576 material”. Finally, defense counsel concluded: “I submit, falling clearly within the doctrine that is the facts, the whole facts have to be presented to the judge and I submit that in this state, at least the law is the judge has to look at the material because otherwise he is delegating his authority, which the Court of Appeals says he can’t do.” The proposition that the magistrate unconstitutionally delegated his responsibility to conduct a full and searching inquiry by relying upon investigator’s affidavits was immediately, and sharply, disputed by the Assistant District Attorney.
By order dated March 23,1984, the Village Court granted the motion to suppress, and held: “In this instance, it was an investigator assigned to the District Attorney’s office who made the allegation that the materials seized were obscene”. The order of suppression was affirmed by County Court, Erie County, upon the theory that “[u]nder the circumstances of this case, the Court finds the holding of the Court below that under New York law, the issuing magistrate had failed to make an adequate finding of probable cause for the issuance of the warrant because he relied solely upon the affidavits of the police officers without any further investigation or viewing of the materials to be confiscated, was not an improvident abuse of discretion.”[2]
I begin my analysis by recognizing that the People of New York, through the Legislature, have declared that the evils of obscenity, reasonably created or advanced by its promotion, justifies such invasion of the freedom of expression as is necessary to avoid the danger presented. Defendants have been charged with multiple counts of promoting obscenity in the third degree (Penal Law § 235.05 [1]). Penal Law § 235.05 (1) provides that “[a] person is guilty of obscenity in the third degree when, knowing its content and character, he [p]romotes, or possesses with intent to promote, any obscene material”. Penal Law § 235.00 defines the word “obscene” in the following manner: “Any material or performance is ‘obscene’ if (a) the average person, applying contemporary community standards, would find that considered as a whole, its predominant appeal is to the prurient interest in sex, and (b) it depicts or describes in a patently offensive manner, actual or simulated: sexual intercourse, sodomy,[3] sexual bestiality, masturbation, sadism, maso *577 chism, excretion or lewd exhibition of the genitals, and (c) considered as a whole, it lacks serious literary, artistic, political and scientific value. Predominant appeal shall be judged with reference to ordinary adults unless it appears from the character of the material or the circumstances of its dissemination to be designed for children or other specially susceptible audience”. This definition, added by the Laws of 1974 (ch 989), was adopted to conform New York’s definition of obscenity to that articulated by the Supreme Court in Miller v California (413 US 15). (See, Memorandum of Approval, Malcolm Wilson, 1974 McKinney’s Session Laws of NY, at 2124.) As Penal Law § 235.00 was adopted with the express purpose of incorporating into New York law the Federal standard of obscenity set forth in Miller, and indeed is identical thereto, application of that statute necessarily entails interpretation of the Federal guidelines. Thus, it cannot fairly be said that the majority opinion rests upon “bona fide separate, adequate, and independent [state] grounds” (Michigan v Long, 463 US 1032, 1041; compare, New York v Uplinger, 467 US 246 [Per Curiam]).
The legitimate policies vindicated by vigorous enforcement of obscenity laws have been well explored by the Supreme Court. There exists a social interest in order and morality which is advanced by reasonable governmental restraint over the public distribution and sale of obscene movies. (Paris Adult Theatre I v Slaton, 413 US 49, 61; Roth v United States, 354 US 476, 485; Chaplinsky v New Hampshire, 315 US 568, 572.) This State has made a judgment that the promotion of obscenity has a tendency to injure the community as a whole or jeopardize, in Chief Justice Warren’s words, the “right * * * to maintain a decent society”. (Jacobellis v Ohio, 378 US 184, 199 [dissenting opn].) The Legislature does, of course, have the power to make moral, as well as social, judgments. (People v Onofre, 51 NY2d 476, 494 [Jasen, J., concurring].) Such a judgment was rendered by enactment of laws proscribing the promotion of obscene materials. The underlying social and moral purpose of New York’s restriction upon the promotion of obscenity was highlighted by Judge Scileppi, when he stated: “It is regrettable that freedom of expression — one of our most cherished liberties — is perverted by those who profit from the salacious and obscene at the expense of decency and morality, as a spurious rallying cry to defeat the high purpose contained in our obscenity laws. Obscen *578 ity is striking a telling blow at community decency and morality everywhere with impunity.” (Scileppi, Obscenity and the Law, 10 NY L Forum 297, 305 [1964].)
New York’s obscenity laws further serve to protect the participants in the visual depiction of sexual conduct. (New York v Ferber, 458 US 747, 764, revg 52 NY2d 674; see, Jacobs, Patterns of Violence: A Feminist Perspective on the Regulation of Pornography, 7 Harv Women’s LJ 5, 18-23.) The Supreme Court has recognized that there exists a qualitative distinction between the visual depiction of sexual conduct and the printed description of such conduct. (New York v Ferber, 458 US 747, 764, supra.) A state has a heightened interest in the regulation of the photographic portrayal of sexual conduct since it is necessarily connected to participatory conduct of actual parties. The visual depiction of sexual conduct presents the real potential for physical and psychological harm to the participants. In California v LaRue (409 US 109,117), the Supreme Court, speaking through Justice Rehnquist, underscored the vital difference between conduct and printed description: “as the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of permissible state regulations significantly increases. States may sometimes proscribe expression that is directed to the accomplishment of an end that the state has declared tó be illegal when such expression consists, in part, of ‘conduct’ or ‘action’”. The regulation of visually depicted obscenity limits the distribution of materials produced by conduct or action harmful to the participants therein. It is thus unrealistic to suggest that the regulation of obscenity is merely to limit the dissemination of offensive ideas. The promotion of obscenity for profit creates and advances a clear and present danger to the participants in the movies, as well as to women generally, resulting from conceivable instances where a viewer of such films seeks, by compulsion, to simulate that which he has viewed.[4] When this court imposes additional burdens upon the magistrate and law enforcement personnel, and thereby disregards the probable cause standards utilized by virtually every other American court, the legitimate policies of protecting the *579 community, the participants in visually depicted obscenity, and women generally, are unnecessarily undermined.
Applying these principles, it is necessary to review whether the magistrate erred in issuing the search warrant. It is unquestioned that in situations in which the materials to be seized may be entitled to protection under the 1st Amendment, the requirements of the 4th Amendment should be scrupulously honored. (See, Zurcher v Stanford Daily, 436 US 547, 564-565; Stanford v Texas, 379 US 476, 485, reh denied 380 US 926; Marcus v Search Warrant, 367 US 717, 732-733.) While it can be said that the Supreme Court has not provided clear guidelines in determining probable cause for obscenity, nevertheless, there is certainty that 1st Amendment due process requires that a focused judicial determination be made of the character of expression prior to seizure. (Marcus v Search Warrant, supra, at p 732; Monaghan, First Amendment “Due Process”, 83 Harv L Rev 518, 522; cf. Maryland v Macon, 472 US _, 105 S Ct 2778, 2782-2783.) The critical question is whether the affidavits were sufficiently detailed to permit the magistrate to focus searchingly on the question of obscenity. In my view, the procedure utilized by the magistrate and law enforcement personnel demonstrated the requisite sensitivity to freedom of expression, and was both reasonable under the circumstances and constitutional.
I am disturbed by the majority’s departure from the traditional principles governing judicial review of a warrant issued upon probable cause. I had thought, as we have repeatedly held, that search warrant applications should be read in a commonsense and realistic manner and not in a hypertechnical manner. (People v Hanlon, 36 NY2d 549, 558-559.) A showing of probable cause requires much less evidence than does a finding of guilt. (United States v Ventresca, 380 US 102.) In dealing with probable cause, as the name itself implies, we deal with probabilities. (New York v Quarles, 467 US_, 104 S Ct 2626; United States v Pryba, 502 F2d 391, 404, cert denied 419 US 1127.) Where the facts set forth in the police affidavits are sufficient in themselves to warrant a man of reasonable caution in the belief that the subject materials are obscene, probable cause exists and the magistrate may properly issue the warrant. (Illinois v Gates, 462 US 213; Carroll v United States, 267 US 132,162.) Concomitant with the traditional deference paid to a magistrate’s determination of probable cause by reviewing courts, we must recognize that our task is not to substitute our judgment as to probable cause but merely to determine whether there was a substantial basis for the magistrate’s determination. (Id.; see also, United States v Fuller, 441 F2d 755, 759.)
*580 I take issue with the majority that the affidavits furnished the issuing magistrate did not describe the essential nature of the movies as a whole. Each of the affidavits describing the films clearly state at the outset that “the content and character of the above mentioned video movie is as follows.” Inasmuch as the magistrate was reviewing affidavits describing movies which were advertised.by defendants as “adult cassette movies”, it was reasonable for him to believe that the affidavits faithfully and accurately described the substance of each movie as a whole. Each affidavit describes the numerous acts of deviate sexual intercourse and the objectification of women occurring in each film which the majority concede to be offensive. Each film is of relatively short duration. Manifestly, the acts described in each movie consume a substantial time span. Thus, the magistrate may reasonably have concluded that the described, successive acts of deviate sexual intercourse pervaded each film. When the title of each movie is considered together with its plot and setting, its general theme and serious value, if any, may reasonably be discerned. The films were described in each of the five nonconclusory affidavits in such a fashion as to permit the magistrate to focus searchingly on the issue of obscenity. Under these circumstances, there was a reasonable basis for the magistrate to authorize the seizure of the films in question.
It is the majority’s view that the affidavits provided the magistrate with insufficient information to determine probable cause for obscenity since the affidavits purportedly do not indicate whether the acts described “constitute all, most or a few of the scenes presented in the films.” (Majority opn, at p 571.) This statement is factually incorrect. First, as noted above, it is clear that each affidavit recited that it described the “content and character” of each movie. This statement provided the magistrate with a reasonable basis to infer that the affidavits described most or all of the activities portrayed in each film. Second, the allegations in two of the affidavits state that the deviant sexual intercourse depicted in each film is pervasive. The affidavit describing “All American Girls” notes that “[throughout the movie, the [six] girls reminisce about their high school days with each one depicting her sexual acts with her male partner.” (A-3; emphasis supplied.) Also, in the affidavit describing the film entitled “Debbie Does Dallas”, it is stated that “[throughout, the movie depicts some lesbianism along with sexual acts of intercourse, fellatio and cunnilingus.” (A-5; emphasis supplied.) The use of the word “throughout” should certainly convey to any reasonable person that all or most of the *581 movie has been described. It could not be more plainly said to permit a reasonable inference that the films predominantly depicted obscene sexual conduct. Any other reading of the affidavits is to substitute this court’s judgment for that of the magistrate and improperly engage this court in a hypertechnical and semantical review of the affidavits.[5]
The decision of the United States Court of Appeals for the District of Columbia in United States v Pryba (502 F2d 391, cert denied 419 US 1127, supra), which the majority expressly declines to follow (majority opn, at pp 572-573, n 4), is the leading Federal case concerning the sufficiency of affidavits submitted to demonstrate probable cause in obscenity cases. In Pryba, defendant was convicted of interstate transportation of obscene matter and possession of such matter with intent to disseminate. On appeal, defendant challenged the search of his premises on the basis that the affidavit underlying the warrant was insufficient to establish probable cause. The magistrate did not personally view the films alleged to be obscene. The description of the films to be seized was set forth in an affidavit which merely stated that: “The above films depict a man and a female engaged in sexual intercourse, and various other sexual activities by males and males and males and females.” (502 F2d, at p 410 [15].) Applying the constitutional test of obscenity as set forth in Miller (502 F2d, at p 404, n 90), and noting that the affidavit “describes, though in good taste briefly, what the films depict” (502 F2d, at p 404) the D. C. Circuit held: “The question before the [warrant issuing magistrate] was whether, on the allegations of the affidavit, there was probable cause for believing that a violation of obscenity laws had occurred. And ‘[i]n dealing with probable cause, * * * we deal with probabilities’; ‘the term “probable cause” * * * means less than evidence which would justify condemnation’. The affidavit stated that the ‘films depict’ not only ‘a man and a female engaged in sexual intercourse’, but also ‘various other sexual activities by males and males’ as well as by ‘males and females’. We have no difficulty whatever in accepting that information as an adequate foundation for a belief by the [warrant issuing magistrate], if persuaded to so believe, *582 that the films might well be adjudged obscene.” (502 F2d, at p 404 [citations omitted; emphasis supplied].) The D. C. Circuit clearly illustrates the proper role of a reviewing court in adjudging a magistrate’s probable cause determination, and rejects the notion, adopted today by the majority in this court, that the supporting affidavit must unambiguously establish obscenity in order to demonstrate a probability that the film is obscene under the Miller test. (See also, United States v Sherpix, Inc., 512 F2d 1361, 1368, 1369 [DC Cir]; United States v Middleton, 599 F2d 1349, 1356, 1358 [5th Cir]; United States v Sherwin, 572 F2d 196,198, n 3 [9th Cir], all of which expressly embrace the Pryba view.)
The recent case of Sequoia Books v McDonald (725 F2d 1091 [7th Cir], cert denied_US_, 105 S Ct 83) is instructive as to the issue at bar. In Sequoia, the Seventh Circuit addressed a claim brought by Sequoia seeking the return of seized magazines and an injunction against future seizures. Certain materials had been seized solely on the basis of a detailed affidavit from a police investigator which described nine magazines. One magazine was thus described: “Magazine entitled ‘Let’s F_’ containing therein pictures describing vaginal intercourse, anal intercourse, eunnilingus and fallatio [sic].” Rejecting defendant’s assertion that the affidavit failed to show probable cause that the seized material was obscene, Circuit Judge Posner, speaking for a unanimous court, stated: “There was, it is true, a possibility that photographs of sexual acts might be redeemed by aesthetic or other values, and hence that the officers might seize constitutionally protected materials. But the possibility was slight. * * * The slight possibility of a temporary suppression of constitutionally protected sex magazines is not enough to invalidate the warrant under the Fourth Amendment.” (725 F2d, at pp 1093-1094.) Sequoia Books, like Pryba, demonstrates the needlessness and irrelevance of the majority’s requirement for mathematical specificity in warrant affidavits submitted at the probable cause stage of an obscenity prosecution. (See also, United States v Christian, 549 F2d 1369 [10th Cir], cert denied 432 US 910; State v Tavone, 482 A2d 693 [RI], cert denied US _, 105 S Ct 1879; People v Hobbs, 59 Ill App 3d 793, 375 NE2d 1367.)
The Federal authorities cited by the majority, which are affirmatively relied upon to demonstrate examples of affidavits containing sufficient information, simply do not support their holding. In United States v Espinoza (641 F2d 153, cert denied 454 US 841 [majority opn, at p 572]), the warrant affidavit was *583 deemed sufficient despite the fact that the 11-line summary of a 36-page magazine failed to indicate whether it encompassed the entire magazine or describe the text accompanying photographs. United States v Sherpix, Inc. (512 F2d 1361, supra [majority opn, at p 572]) merely reiterated the rule set forth by the United States Court of Appeals for the District of Columbia in Pryba, discussed above, and certainly did not require an unambiguous showing of obscenity. In United States v Middleton (599 F2d 1349, supra [majority opn, at p 572]), the affidavit does not purport to summarize every scene, as the majority would here require, and the case relies heavily on Pryba. United States v Marks (520 F2d 913 [majority opn, at p 572]) is of virtually no precedential value since the extremely brief summaries were buttressed by a preseizure obscenity hearing — a procedure never required in New York (see, People v Heller, 29 NY2d 319), and, indeed, the case was later reversed by the Supreme Court (413 US 483).
As a final point, I would note that the scope and execution of the warrant in this case were closely circumscribed to avoid impermissible interference with constitutionally protected expression. The 4th Amendment requirement that warrants particularly describe the item to be seized must be observed with the most scrupulous exactitude when the material to be seized implicates 1st Amendment interests. (Stanford v Texas, 379 US 476, 485, supra.) Strict adherence to the constitutional requirement of particularity eliminates any possibility that the officer in the field will exercise independent discretion and seize materials not judicially determined to be obscene. Ad hoc, nonjudicial determinations of obscenity, made at the site of the seizure, are constitutionally proscribed. (See, e.g., Marcus v Search Warrant, 367 US 717, 731-732, supra.) In this case, however, the particularity requirement was scrupulously honored. The warrant authorized detention of 10 specifically named films which had been individually described in detail in police affidavits. Only those films were ordered detained. Thus, the warrant’s scope was limited and reasonable.
A critical inquiry in a judicial determination as to the constitutional validity of a seizure of presumptively protected materials is the purpose for which the warrant was issued. Seizure may be effected to garner evidence for use in a subsequent criminal proceeding or, alternatively, to suppress and destroy the obscene materials. Where there is a seizure of large quantities of books for the sole purpose of their destruction, a prior judicial determination of obscenity in an adversary hearing is required to avoid abridgement of the public’s right to unobstructed circulation of *584 nonobscene books. (A Quantity of Books v Kansas, 378 US 205, 213; see also, Heller v New York, 413 US 483, 491, supra; Marcus v Search Warrant, 367 US 717, supra.)
Here, however, the purpose of the search of the premises of Network Video and the detention of the 10 films specifically named in the warrant application was solely to secure evidence to aid in the prosecution of defendants for promoting obscenity. There was no actual or constructive “seizure”. As evidenced by the sworn, itemized inventory statement, only one or two copies of each of the films specified in the warrant application were taken during the execution of the warrant. The terms of the. warrant commanded the police officers to enter Network Video and upon finding the named property, “it” was to be detained. In view of the detention of only one or two copies of each film named in the warrant, the executing officer understood the limitations and specificity of the warrant. (See, Stanford v Texas, 379 US 476, 485, supra; Andresen v Maryland, 427 US 463, 493 [Brennan, J., dissenting].) Moreover, there has been no showing that defendants were precluded, by injunction or otherwise, from offering for rental other copies of the movies or restocking their supply of said movies. As in Heller v New York (413 US 483, 490, supra), the films were not subject to any form of “final restraint”. There was no injunction against exhibition or threat of destruction. Rather, one or two copies of each film were merely detained for preservation as evidence (Perial Amusement Corp. v Morse, 482 F2d 515, 525 [2d Cir]).[6] The limited nature of the detention represents a bona fide attempt to strike a proper balance between the need to preserve evidence for use in criminal prosecutions and the right of the public of unobstructed access to nonobscene materials. (See, Sequoia Books v McDonald, 725 F2d 1091, 1093-1094, cert denied_US _, 105 S Ct 83, supra.)
Accordingly, it is my view that the order of County Court should be reversed, the motion to suppress denied, and the case remitted to the Depew Village Court for further proceedings.
Chief Judge Wachtler and Judges Meyer, Kaye and Alexander concur with Judge Simons; Judge Jasen dissents and votes to reverse in a separate opinion; Judge Titone taking no part.
Order affirmed.
*585 APPENDIX
A-l
“TABOO II”
David J. Groblewski, being duly sworn, deposes and says:
I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney’s Office and prior to this, a member of the New York State Police for approximately 25 years.
On September 23rd, 1983, I viewed the video tape movie “taboo ii”, which was rented on September 20th, 1983, from Network Video, 5868 Transit Road, Depew, New York. This movie was rented by Detective Sergeant Vincent Costanza, a member of the Erie County Sheriff’s Department. This movie was viewed in my office starting at 9:00 A.M. and with several interruptions lasted until 12:12 P.M.
The content and character of the above mentioned video movie: The theme of the movie is a middle-class neighborhood where a home is the place where all the sexual acts are performed. The movie starts with a brother and sister, a white male and white female, fondling each other. The second scene is another house scene where a white male and white female are giving a rubdown to a white female. The sexual acts that follow include cunnilingus and fellatio. There is also intercourse and the scene closes with the male placing his penis between the girl’s breasts and ejaculating into and over her mouth. In another scene there is some incestuous type activity between the brother and the sister where again fellatio and intercourse are performed. At one point during the movie the mother enters the bedroom and observes the two performing the sexual acts and becomes depressed about the situation. In a later scene the son and his mother are on a couch where they become involved in sexual acts of intercourse and fellatio. The movie closes with the mother and father asleep in their bedroom at which time the daughter enters and sleeps next to her father, where they perform incestuous acts of intercourse, and she performs fellatio on her father.
A-2
“CALIFORNIA VALLEY GIRLS”
David J. Groblewski, being duly sworn, deposes and says:
I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney’s Office and prior to this, a member of the New York State Police for approximately 25 years.
On September 26, 1983 I viewed the video tape movie “california valley girls”, which was rented on September 20th, *586 1983, from Network Video, 5868 Transit Road, Depew, New York. This movie was rented by Sergeant Vincent Costanza, a member of the Erie County Sheriff’s Department. This movie was viewed in my office starting at 12:00 Noon and lasted until 1:33 P.M.
The content and character of the above mentioned video movie is as follows: Six white females, approximately 18 to 25 years of age, are unemployed and attempt to make a living by becoming prostitutes. The first scene is a bedroom scene where two females are involved in love making, fondling and cunnilingus. The second scene depicts a white male and a white female having intercourse in the back of a van. The third scene is a house scene where six girls, all white females are introduced to the art of love making. One male, approximately 35 years of age, is teaching the girls the art of fellatio with each one of them performing this act on him. The next scene is a bedroom scene in a home where a husband and wife, a white male and a white female, alone with a girl, a white female, perform various sexual acts which include intercourse, fellatio, anal intercourse and cunnilingus. The movie ends with some lesbianism where the wife performs cunnilingus on the girl while she performs fellatio on the husband and they engage in intercourse and anal intercourse.
A-3
“ALL AMERICAN GIRLS”
David J. Groblewski, being duly sworn, deposes and says:
I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney’s Office and prior to this, a member of the New York State Police for approximately 25 years.
On September 28th, 1983, Detective Sergeant Vincent Costanza, a Member of the Erie County Sheriff’s Department and I viewed the video tape movie “all American girls”, which was rented on September 27th, 1983 from Network Video, 5868 Transit Road, Depew, New York. This movie was viewed in my office starting at 11:35 A.M., and lasted until 1:00 P.M.
The content and character of the above mentioned video movie is as follows: The theme of the movie is a home of one of six girls, all white females who had previously attended high school and were meeting for a reunion. The first scene is two girls in a room performing acts of lesbianism, namely cunnilingus on each other. They are met by a white male and they perform acts of fellatio on him, have intercourse and all leave the room. Throughout the movie the girls reminisce about their high school days with each one depicting her sexual acts with her male partner. The sexual acts which followed included intercourse, fellatio and cunnilingus.
*587 A-4
“TABOO”
David J. Groblewski, being duly sworn, deposes and says:
I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney’s Office and prior to this, a member of the New York State Police for approximately 25 years.
On September 29th, 1983, I viewed the video tape movie “taboo”, which was rented on September 27th, 1983 from Network Video, 5868 Transit Road, Depew, New York. This movie was rented by Detective Sergeant Vincent Costanza, a member of the Erie County Sheriff’s Department. This movie was viewed in my office starting at 11:00 A.M. and lasted until 11:55 A.M. and watched again commencing at 1:42 P.M. and lasting until 2:23 P.M.
The content and character of the above mentioned video movie is as follows: The first scene is a bedroom scene where two white females and one white male perform various acts of fellatio, cunnilingus and intercourse. The second scene is a house party scene where many white males and white females are involved in various acts of intercourse, fellatio and cunnilingus. There is also a scene where females perform acts of cunnilingus on each other. The movie portrays at one point a bedroom scene with a white male, the son, laying in bed naked, at which time his mother, a white female enters the room. She makes love to him and incestuous acts of intercourse, placing of the penis between her breasts, ejaculation and cunnilingus are performed.
A-5
“DEBBIE DOES DALLAS”
David J. Groblewski, being duly sworn, deposes and says:
I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney’s Office and prior to this, a member of the New York State Police for approximately 25 years.
On October 3rd, 1983, Detective Sergeant Vincent Costanza, a member of the Erie County Sheriff’s Department and I viewed the video tape movie “debbie does dallas”, which was rented on September 30th, 1983, by Vincent Costanza from Network Video, 5868 Transit Road, Depew, New York. This movie was viewed in my office starting at 2:50 P.M. and lasted until 4:23 P.M.
The content and character of the above mentioned video movie is as follows: The theme of the movie is a girl moving out west for a change of atmosphere. The first scene is a jail scene where a *588 white female is in jail after she had been put there by the so-called Sheriff, a white male, and she performs fellatio on him. The two then perform intercourse, at which time he removes his pants and ejaculates over her buttocks. The second scene is the ranch, a so-called house of ill repute, a bedroom scene in which a white male and a white female are involved in various sexual acts including fellatio, cunnilingus and intercourse. At the end of the scene the male ejaculates in and over the female’s mouth. The third scene, a bathroom scene, depicts some lesbianism involving three girls. They participate in love making, foreplay and performing cunnilingus on each other. Throughout, the movie depicts some lesbianism along with sexual acts of intercourse, fellatio and cunnilingus.

. This inclusion of affidavits is necessary to demonstrate what I believe to be the sufficiency of the information contained therein to support a probable cause determination, and is in accordance with the general practice of the courts which have addressed this issue (see, e.g., People v Hobbs, 59 Ill App 3d 793, 375 NE2d 1367, 1370; State v Tavone, 482 A2d 693, 697-698, n 2 [RI]; United States v Middleton, 599 F2d 1349,1351-1354 [5th Cir]; United States v Pryba, 502 F2d 391,410-411 [DC Cir], cert denied 419 US 1127; United States v Christian, 549 F2d 1369, 1370 [10th Cir], cert denied 432 US 910).

. It is only by review of defense counsel’s arguments before the suppression court that the holding of the Village Court, that the police investigator made the allegation of obscenity, may be understood.

. Penal Law § 235.00 (7) defines “sodomy” as any of the types of sexual conduct defined in Penal Law § 130.00 (2). Penal Law § 130.00 (2) defines *577 “deviate sexual intercourse” or “sodomy” as “sexual conduct between persons not married to each other consisting of contact between the penis and the anus, the mouth and penis, or the mouth and the vulva”.

. See, The Pornography Victims Protection Act of 1985, Senator Arlen Specter, S 1187,131 Congressional Record, 99th Congress, pp S 6853-6855; see also, Senate Resolution 477, Oct. 13, 1970, 116 Congressional Record 36459-60, whereby the United States Senate, in a 60-5 vote, rejected the majority report issued by the President’s Commission on Obscenity and Pornography which found no relationship between obscenity and antisocial conduct.

. The majority asserts, without illustration, that the statements utilizing the word “throughout” are “patently ambiguous” and “may also be interpreted in other, less inculpatory ways.” (Majority opn, at p 571.) The word “throughout” is defined by Webster’s Third New International Dictionary as meaning “in or to every part: from one end to the other: everywhere”. The use of the word “throughout” hardly creates or contributes to a patent ambiguity. Instead, it was indeed an attempt to describe the films as a whole, the continuity of the action or the pervasiveness of the sexual conduct.

. The Supreme Court has noted the special problems associated with the preservation of movies as evidence: “We again take judicial notice that films may be compact, may be easy to destroy or to remove to another jurisdiction, and may be subject to pretrial alterations by cutting out scenes and resplicing reels.” (Roaden v Kentucky, 413 US 496, 505, n 6; Heller v New York, 413 US 485, 493.)